# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

RYAN STILLMAN LUCAS,          )
)
)
Plaintiff,                 )     Civil Action No.: 7:13cv00055
)
v.                     )
)
GARY L. SHIVELY, et al.,      )     By: Hon. Michael F. Urbanski
)          United States District Judge
)
Defendants.           )
)

## MEMORANDUM OPINION

This matter is before the court on the summary judgment motions of defendants Patrick Lamb ("Lamb") and Gary L. Shively ("Shively"). Dkt. Nos. 37 & 38, respectively. Both defendants assert that qualified immunity bars this civil rights action. The court heard oral argument on these motions on April 25, 2014. Dkt. No. 60. At that time, the court requested supplemental briefing on fingerprint analysis, specifically the verification step of the "ACE-V" (analysis, comparison, evaluation, and verification) process. The parties have filed their briefs on that issue and the matter is now ripe for decision.[1] For the reasons stated herein, the court will **GRANT** the defendants' motions.

## I.

Plaintiff Ryan Stillman Lucas ("Lucas") brings this action pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his Federal Constitutional rights by arresting him without probable cause. Specifically, he asserts claims for false arrest, false imprisonment, and malicious

---

[1]Plaintiff filed additional evidence on May 22, 2014. Dkt. No. 65. Lamb moved to strike this evidence the next day. Dkt. No. 66. The court will **DENY** the motion to strike and consider all of the evidence that has been submitted by the parties.

prosecution under the Fourth and Fourteenth Amendments.  He also asserts pendent state law claims for false arrest and false imprisonment.  All of Lucas' claims arise from his arrest on April 24, 2012, on five warrants – four felonies and one misdemeanor – related to two burglaries.  The facts surrounding the burglaries and the ensuing investigation by the defendants are as follows:[2]

### A.  The Burglaries

In December of 2009, multiple items, including a 50 inch television, power tools, and a shotgun, were stolen from a vacation home located near Smith Mountain Lake in Franklin County, in southwestern Virginia.  Items were taken both from the home itself and from a detached garage. Deputies from the Franklin County Sheriff's Office initially responded to the burglary, but Shively, a Sheriff's Office's investigator, was contacted because a firearm was among the stolen items.  At the scene, Shively was able to lift three latent fingerprints from the medicine cabinet in the master bedroom, collect footwear impressions, and photograph pry marks from tools on several doors.  See generally, Franklin County Sheriff's Office Report, Dkt. No. 44-1; Shively Dep., at 20:20-22:21. Believing the fingerprints to be of sufficient quality, Shively submitted them to the Virginia Department of Forensic Science Western Laboratory.  Shively Dep., at 25:25-26:9.  Shively did not receive any information back and the case went dormant at that time.  Id. at 26:25.

The second burglary occurred on March 22, 2012, in Fredericksburg, a city in northern Virginia.[3]  The homeowner and his daughter walked in on the burglary in progress.  An officer from the Fredericksburg Police Department initially responded and received a description of the

---

[2] It is worth noting that this case is somewhat unique in that a significant number of key conversations were recorded and subsequently transcribed.  Thus, exactly what was said, to whom, and when, is frequently undisputed.

[3] According to Google Maps, it is approximately a three and three quarters hour drive from Franklin County to Fredericksburg.  See Driving Directions from Franklin County to Fredericksburg, VA, Google Maps, http://maps.google.com (follow "Get Directions" hyperlink; then search "A" for "Franklin County, VA" and search "B" for "Fredericksburg, VA"; then follow "Get Directions" hyperlink).

perpetrator: a white male; mid-twenties; 5 foot 6 to 5 foot 8; weighing 140-165 pounds; tattoos on

both arms; and short brown wavy hair.  The only items stolen were a piggy bank and small sum of

money; several items of value were apparently passed over.  The piggy bank was recovered outside

the home.  Approximately forty-five minutes after the initial responding officer arrived, Lamb, a

detective and fingerprint examiner with the Fredericksburg Police Department, arrived at the scene.

Lamb was able to lift latent fingerprints from the piggy bank and a gel lift of a footwear impression

from the yard adjacent to the burglarized home.[4]  Lamb also received a description of the suspect

from the homeowner similar to what was conveyed to the initial responding officer: a shirtless white

male; possibly early to mid-twenties to early-thirties in age; tattoos on both arms with the forearm

tattoos being particularly noticeable; no tattoos on his back, which was pale – not sun tanned; no

"farmer's tan" line on the back of the neck; and shorter brown hair that may have been "wavy" that

looked to be "neatly cut."  See generally, Fredericksburg Police Dep't Report, Dkt. No. 40-3., at 2-4.

## B.  The Investigation

The Fredericksburg police began canvassing the area for suspects.  The burglarized home

was near a wooded area containing a number of homeless camps.  One officer contacted a homeless

individual known to the police.  That individual reported that there was a new person in the

homeless community that matched the physical description of the suspect.  This newcomer,

according to the tipster, possibly had the first name "Ryan."[5]  See generally, Lamb Dep., at 106:1-

107:9

---

[4] Lamb also recovered a partial print from a coin tray, but did not consider it to be of sufficient
quality to allow for further investigation.  Lamb Dep., at 103:24-104:3.

[5] After providing this information, the tipster was transported to Snowden at Fredericksburg.
Snowden bills itself as a "comprehensive behavioral health services" hospital, providing both mental
health and substance abuse treatment.  Neuroscience Center of Excellence, Mary Washington
Healthcare, (June 30, 2014), http://www.marywashingtonhealthcare.com/mwhc-neuroscience-
center/behavioral-health.  When asked at his deposition whether the fact that this individual needed

That evening, Lamb ran one of the latent fingerprints (L2) from the piggy bank through a database of known prints. This database is made up of fingerprint cards, known as "ten print cards," of known individuals. Lamb used the Automated Fingerprint Identification System ("AFIS") to search this database and generate a "candidate list" of potential matches. Lamb then compared the L2 latent to the prints of seven known individuals. Based on his comparisons, Lamb excluded all of them as potential suspects in the Fredericksburg burglary. See Fredericksburg Police Dep't Report, Dkt. No. 40-3, at 5.

On March 26, 2012, Lamb ran another latent print (L6) through the known prints database. Again, Lamb excluded any potential suspects from the AFIS generated candidate list. Lamb Dep., at 112:12-113:9. Next, Lamb ran L6 through a database of unknown latent prints. After his latent-to-latent comparison of L6 to the AFIS generated candidate list, Lamb believed that he had a "hit" – a latent with sufficient similarity to L6 to warrant further investigation.[6] This hit was the latent fingerprint submitted by Shively in 2009 relating to the Franklin County burglary. Id. at 115:24-116:7; id. at 116:23-117:4.

Shively's Franklin County latent had been entered into the database of unknown latent prints by Lyle Shaver at the Virginia Department of Forensic Science Western Laboratory. Just after 9:00

---

to be transported to Snowden affected the reliability of the information he provided, Lamb testified that "whenever he receives information from a homeless subject, he takes it with a matter of 'professional skepticism.'" Lamp Dep., 109:13-20. However, he stated that he found the nature of the physical description provided, and the fact that this individual was willing to give information about another member of the homeless community, "extremely interesting" and that, at that time, he found the information that had been provided to be fairly reliable. Id. at 109:21-110:11.

[6] Lamb's report says that L6 "was individualized to the same contributor from our crime scene and the unknown latent impression of Franklin County." Lamb Dep., at 117:5-8. However, at his deposition Lamb stated that his use of the word "individualized" was inaccurate, and that he merely had identified enough similarity at that time to warrant further investigation. Individualization, according to Lamb, requires actually having both latent prints to compare. The copy of the Franklin County latent pulled by AFIS from the database was not of sufficient quality to use for individualization. Id. at 117:11-16.

4

a.m. on March 28, 2012, Lamb spoke with Shaver. Lamb informed Shaver that he had gotten a "hit" on a latent print Shaver had entered into the database. Tr. of Recorded Conversations, Dkt. No. 44-2, at 2:19-20. Shaver asked if the latent print Lamb had recovered was in the system; Lamb confirmed that it was and gave Shaver the key number. Lamb and Shaver then discussed how they would proceed:

> Shaver: Oh okay. Uh, what I will try to do is I will try to pull these up.
>
> Lamb: Okay.
>
> Shaver: And make sure everything looks good from my standpoint and then I will, uh, - - contact the investigating agency from, from out here whoever that might've been and let them know that there's a link between these two cases. . . .

Id. at 4:21-5:4. After Shaver confirmed that Lamb was the lead investigator for the Fredericksburg burglary and acquired Lamb's contact information, the conversation continued:

> Shaver: Okay, I will pass this information along. I'll pull it up and see what I got and then, uh, hopefully I'll let, so that way we'll know if something comes up. One of us gets a legitimate suspect and they may have one.
>
> Lamb: Yeah, that's what I'm hoping we can put a name on this joker.
>
> Shaver: All right.
>
> Lamb: Now, my quality of my print, it doesn't look so good on Avis[7] screen, I'll be happy to, uh, you know, email you a digital image if that would be easier to work with. That's what I do is use a digital scan to match to your print, your print's a lot better.
>
> Shaver: Okay. I probably didn't develop it so I can't take any credit for that.
>
> [laughter]
>
> Shaver: Anyway, let me, let me see, uh, who, uh, who we got here and what all's going on and then, uh.
>
> Lamb: Okay.

---

[7] This should almost certainly be "AFIS."

> Shaver: And then I will either get back with you or I'll let the investigator get back with you.

Id. at 5:20-6:18. At this point, the two men exchanged goodbyes and the call ended.

The next day, March 29, 2012, Shaver called Lamb at 1:00 p.m. Shaver first confirmed that the victims of the two burglaries were not the same. Shaver then told Lamb that the only information he had on the prior burglary was that "two suspects entered the residence and stole numerous items." Id. at 22:18-20. Shaver then stated:

> Shaver: Yeah and, um, let me be, what I'll do is I'll just give you the investigator's name and phone number.
>
> Lamb: Okay.
>
> Shaver: And I want you to contact them.
>
> Lamb: Yes, sir.

Id. at 23:2-7. Shaver then proceeded to provide Lamb with the contact information for Shively. The two then briefly discussed their optimism about finding a suspect and then ended their conversation.

Lamb called Shively that same day. He left a message stating that he "got a print off a crime scene that matched to a print from [Shively's] crime scene" and that he had a "very good suspect description" from eyewitnesses that he wanted to share with Shively. Id. at 8:6-11. Shively called Lamb back just before 2:45 p.m. Shively informed Lamb about the nature of the Franklin County burglary: the type of home, its location, when the burglary occurred, what was stolen, and what sort of evidence he had collected from the scene. Lamb then provided Shively with the same sort of information about the Fredericksburg burglary. He also provided Shively with the physical description he had been given by the Fredericksburg homeowner. He also mentioned the name "Ryan":

> Lamb: "[T]he homeless community, different informants are saying there is a guy, younger guy who's newer to the area that matches. Um, and they, uh, the name

Ryan has come up but again nobody, there's not anything you can put any stock in on that."

Id. at 14:5-10. Shively took note of the suspect's distinctive tattoos:

Shively: And you say tattoos on both arms?

Lamb: Yes, sir, very, a lot of tattoos. There was like a sleeve on both arms.

Shively: Okay.

Lamb: And yeah, that was the most distinctive . . . .

Id. at 14:17-23. Shively then stated that he would make some inquiries at a nearby trailer park about an individual named "Ryan" with sleeve tattoos living there at the time of the Franklin County burglary. See id. at 15:20-16:20. Lamb then discussed the nature of what he described as Fredericksburg's "homeless problem" and both men expressed concern that, if the suspect was indeed homeless, that he would be "moving on" as a result of the Fredericksburg burglary. The men then exchanged contact information and Shively told Lamb to call him back the next week if he (Lamb) didn't hear from him (Shively) the next day. Id. at 20:3.

Armed with the suspect's physical description – which Shively described as "run-of-the-mill," with the exception of the tattoos, Shively Dep., at 39:23-40:8 – and the possible name "Ryan," Shively proceeded to visit several businesses near the scene of the Franklin County burglary. According to his deposition testimony, he did not visit the trailer park he had mentioned to Lamb, id. at 42:3-7, but visited a convenience store, a lawnmower repair shop, and a post office, where he described the suspect and passed out business cards. Id. at 40:21-41:2.

On April 3, 2012, at 2:50 p.m., Shively called Lamb and left a message about visiting the stores near the scene of the Franklin County burglary. See Tr. of Recorded Conversations, Dkt. No. 40-6, at 27:8-25. Then, a few days after Shively visited the stores, he received a phone call from one of the storeowners. The storeowner told Shively that, while Shively was in the store, another person

overheard Shively's description of the suspect.  The individual did not want to come forward,[8] and

asked the storeowner to contact Shively.  Shively Dep., at 44:8-23.  The storeowner provided Shively

with the surname "Lucas":

> Shively: [The storeowner] called me and told me the person that I was looking for
> was -- his last name was Lucas.  His -- I think his father's name was Andrew or
> something like that, and generally where he -- where they had lived at one time, you
> know, pointed out that.
>
> And from there I just figured out Ryan Lucas -- the name Ryan Lucas and just got
> the rest of the information through [the Virginia Department of Motor Vehicles
> ("DMV")] computer and so forth.

Id. at 44:24-45:7.[9]  Shively elaborated that he first checked the Sheriff's Office records and found

that they did have a file on a Ryan Lucas.  Lucas had been arrested in 1997 for failure to appear.  Id.

at 48:7-14, 49:8.  The file contained an address, which Shively believed to be close to the location of

the Franklin County burglary.  Id. at 48:4-9.  Shively went to that address, but did not locate Lucas

there and did not recall speaking to anyone at that address.  Id. at 51:10-18.

Shively then turned to the DMV records on Lucas.  These records contained a picture of

Lucas, which was taken on January 22, 2010.  DMV Records, Dkt. No. 40-11, at 2; Shively Dep., at

58:20-22.  The DMV records also indicated that Lucas was five foot ten[10] and weighed 210 pounds.

DMV Records, Dkt. No. 40-11, at 2.  Shively testified he did not view the weight differential

between the physical description provided by the Fredericksburg victim and the DMV record as

---

[8] Shively did not ask the storeowner for this individual's name or otherwise try to contact or locate
the tipster.  Shively Dep., at 45:16-46:10.

[9] Earlier in his deposition testimony Shively seemed to indicate that the tipster did not know a
surname, see Shively Dep., at 42:12-17, but this appears to be a misstatement.  Without a surname it
would not seem possible for Shively to arrive at the name "Ryan Lucas."

[10] Lucas testified at his deposition that he would guess his height at five foot eight.  Lucas Dep., at
16:1-3.

significant.  See Shively Dep., at 53:23-54:1 (Q: "Did you remark on that in any way or have any thoughts about that when you noted the 210-pound weight? A: No.").

Shively noted that the DMV records had a different address for Lucas.  Id. at 51:19-25.  As with the other address, Shively went there, but did not locate Lucas or speak to anyone.  Id. at 51:23-52:10.  He was, however, able to speak with a neighbor, who told him that Lucas – or someone matching his description – lived at the home and worked in Roanoke City.[11]  See id. at 63:6-64:5.  Shively also observed two vehicles at this address:  one which "came and went" and was not registered to Lucas, and one which "stayed in the same place" and was registered to Lucas.  See id. at 52:14-53:1.

After taking these steps in his investigation, see id. at 58:23-59:2, Shively called Lamb on April 11, 2012, to let him know what he found.  He first reminded Lamb of the stores he had visited on April 3:

> Shively: You know I told you I was going to go back over and hit a couple of the stores and I did that and, uh, just yesterday I got a call from a person and said [sic] that your guy has, Ryan, that his father's name is Andre Lucas.
>
> Lamb: Andre, okay.
>
> Shively: And, um, and so I actually looked him up and he was in our system here.
>
> Lamb: Oh okay.
>
> Shively: And, um, he had been arrested on, he's never had any kind of serious charges but he was arrested on a -- -- for failing to appear and the deputy fingerprinted him, of course they never got [sic] but we had -- --.  It was never put in the system but we had fingerprints here.
>
> Lamb: Oh okay.
>
> Shively: Yeah and so, um, and, and you know according to our, when the information that was put in when he was arrested on this -- -- a couple of years ago, you know he did have tattoos on his arms and, um, I'll give you his, um, his

---

[11] Roanoke is located just north of Franklin County.

information where you can get a DMV picture and I'm also going to, I made a photo copy of my fingerprints.

Lamb: Oh okay.

Shively: I'm going to submit mine to the lab and I'm going to send you a photo copy. This is a really good photo copy.

Lamb: Outstanding, I can give you a fax number if you, will it fax?

Shively: I was going to mail them to you but I can try to fax it also.

Lamb: Yes, sir, the, um, well the FBI faxes me some sometimes and, uh, it, uh, -- -- for that fax number now. You know sometimes it comes through real well and we can give it a try and you can drop them in the mail if you want too [sic] as well.

Tr. of Recorded Conversations, Dkt. No. 40-6, at 28:19-30:9. Shively then provided Lamb with Lucas' information and Lamb provided Shively with a fax number.[12] Shively both faxed and mailed a copy of Lucas' prints to Lamb. Shively Dep., at 69:6-8. Shively sent the original copy of Lucas' prints to the Virginia Department of Forensic Science Western Laboratory to compare with the latent prints from the Franklin County burglary.[13] When he received Shively's fax, Lamb compared those prints to the prints he had lifted from the Fredericksburg crime scene, in particular the piggy

---

[12] Lamb also confirmed that the suspect's first name was "Ryan":

Lamb: His name is Ryan?

Shively: It is Ryan.

Lamb: So that homeless guy was right.

Shively: Yeah, yeah.

Lamb: Well I'll be.

Tr. of Recorded Conversations, Dkt. No. 40-6, at 31:1-6.

[13] Shively testified that he may have mailed Lamb the original and mailed the other copy to the Virginia Department of Forensic Science Western Laboratory. Shively Dep., at 69:9-16. This uncertainty is immaterial to the court's decision.

bank that had been recovered. He testified that he "individualized" Lucas' thumb print to the latent left thumb print from the piggy bank. Lamb Dep., 148:3-16.

On April 12, 2012, at 11:50 a.m., Lamb called Shively to inform him of the fingerprint match. He stated that the thumbprint he lifted off of the piggy bank matched the left thumb of Lucas and that he would be getting warrants for Lucas. Tr. of Recorded Conversations, Dkt. No. 44-2, at 48:4-11. In response to this information, Shively stated that he would charge Lucas in connection with the Franklin County burglary that day. Id. at 48:16-20. He also stated that he would start making attempts to find Lucas. Id. at 49:1-3. Lamb responded:

> Lamb: Okay very good and he is actually a suspect in a B and E we had over the weekend.
>
> Shively: Really.
>
> Lamb: And when I get your good prints that you mailed there's a print that was kind of faint that I think was his left middle finger on the known card off our B and E this weekend so he's likely still around here.
>
> Shively: Very good.
>
> Lamb: So when I get that mailed set what I'll do is try to match that print up so he might be getting warrants on him for something else too.
>
> Shively: Okay, well this, you'll like the card, those are beautifully inked prints.
>
> Lamb: Very good, yeah because it's a fax machine but the thumb was really good that, that left thumb was really good on your fax transmission.
>
> Shively: Well good. I'll get warrants today and I will start looking for him.
>
> Lamb: Okay and if we get him, I'll [sic] you know first thing.

Id. at 49:4-50:4. The two men then confirmed that they would each take out warrants and each begin looking for Lucas and ended their conversation.

Five warrants were issued for Lucas on April 12, 2012: from Fredericksburg, one for burglary (Va. Code § 18.2-91) and one for petit larceny (Va. Code § 18.2-96), and from Franklin County, one for burglary and two for grand larceny (Va. Code § 18.2-95). The petit

larceny was a misdemeanor warrant; the other four were felony warrants.  <u>See generally</u>, Arrest Warrants, Dkt. Nos. 40-13 & 40-14.

### C.  Search, Arrest, and Release

After the warrants were issued, Shively visited the Hardy Road address several times to try and find Lucas; he was unsuccessful and therefore turned the manhunt over to the United States Marshals Service.  Shively Dep., at 62:6-12.  The Marshals Service arrested Lucas at his place of employment on April 24, 2012, at approximately 10:30 a.m.  Lucas Dep., at 33:17-20.  Shively then went to Roanoke and brought Lucas back to Franklin County.  During the drive, Lucas denied committing either burglary.  He also denied having ever been to Fredericksburg, although he said that he had met a girl online that he believed lived in the Fredericksburg area.  Additionally, he provided an alibi for the Fredericksburg burglary, stating that he was working that day.  <u>See generally</u>, Shively Dep., at 82:17-84:23; Lucas Dep., at 45:3-47:7.  Lucas provided Shively with the contact information for his employer and Shively stated that, while he would not be investigating the alibi for the Fredericksburg burglary, he would pass that information along to Lamb.  Shively Dep., at 85:5-13.

Shively called Lamb at 1:50 p.m. and left a message providing him with this information, including Lucas' claimed alibi.  <u>See generally</u>, Tr. of Recorded Conversations, Dkt. No. 44-2, at 64:18-65:21; <u>see also</u> Lamb Dep., at 177:21-178:5.  The two men actually spoke at 2:22 p.m.  Lamb asked for pictures of Lucas' tattoos.  Tr. of Recorded Conversations, Dkt. No. 44-2, at 69:21-22.  At this time, both men appeared to have been confident of Lucas' guilt and at one point employed rather colorful language to express their belief that they would soon acquire additional inculpatory evidence against him.  <u>See, e.g.</u>, <u>id.</u> at 74:9-10 (Lamb: "[T]hat'll slam him you know when I show [his picture] to the witnesses"); <u>id.</u> at 74:13-15 (Shively: "We'll get him, we'll get his little d**k knocked in the sand here.").

The next morning, April 25, 2012, at 9:13 a.m., Lamb called Lucas' employer. He was informed that Lucas was working the day of the Fredericksburg burglary until 3:02 p.m. Id. at 84:25-85:1. Lamb asked for a fax copy of Lucas' timesheet. Id. at 84:15-18 ("And so you know that's why I'm calling because if he didn't do it I certainly want to clear him. Is there, could you fax me a copy of that?"). Because the Fredericksburg burglary occurred at 5:08 p.m., Lamb believed it would have been difficult without a helicopter for Lucas to have gotten to Fredericksburg in time to commit the crime. Lamb Dep., at 178:6-22-179:7. At 9:30 a.m., Shively emailed pictures of Lucas to Lamb. He noted Lucas did not have "exactly the full sleeve tattoos [he] was expecting to see." Shively Dep., Pl.'s Ex. No. 11, at 2. Lamb replied by email at 9:33 a.m. He asked if Lucas had "anything further to say about either arrest" and informed Shively that Lucas had not been working at the time of the burglary but that "it would have been a fast trip to get from Salem[14] at 3 PM to here by 5:30 PM…" Id. at 1. Shively responded that Lucas wanted to know if Lamb had checked his work schedule. Shively also asked if "the tattoos or lack of same [sic] bother you as much as it does me?" Id. At 9:49 a.m., Lamb replied as follows:

> It very much does. My witness said he had several tattoos.
>
> I did check his work schedule and he was off during the burglary but he worked that morning and the next morning. The lack of tattoos does worry me. If it wasn't for the thumb print I would think we had the wrong guy! That print did not get into my crime scene by accident!
>
> Thanks for all of your help with this case. It does seem odd that he isn't more upset at being arrested if he is indeed innocent.
>
> Patrick.

Id. Lamb also spoke with Lucas' mother. Lamb Dep., at 183:14-15. Based on the information he received on April 24 and 25, Lamb concluded that Lucas was not in fact the culprit of the Fredericksburg burglary. He testified that the two biggest factors in his conclusion were (1) the

---

[14] The cities of Salem and Roanoke border each other.

timesheet provided by Lucas' employer and (2) his conversation with Lucas' mother, who indicated that Lucas lived at her home in the basement.[15] Id. at 188:19-23; see also id. at 176:23 (Because Lamb believed the culprit of the Fredericksburg burglary to be a homeless person, the fact that Lucas was living in his mother's basement gave Lamb pause); Fredericksburg Police Dep't Report, Dkt. No. 40-3., at 13 (discussing these factors). Lamb believed Lucas' mother to be sincere. Lamb Dep., at 189:1-8.

Consequently, Lamb met with his lieutenant. Id. at 179:21-180:3. On April 26, Lamb met with the Fredericksburg Commonwealth's Attorney's Office and stated his belief that the Fredericksburg charges should be dropped. See id. at 180:13-20.[16] Those charges were dismissed by the court on April 27. See Nolle Prosequi Order, Dkt. No. 40-15. Lucas was released from jail that same day. Lucas Dep., 22:7-11.

On April 30, 2012, the Virginia Department of Forensic Science Western Laboratory issued a Certificate of Analysis concluding that Lucas was not the source of the Franklin County latent print. Shively Dep., at 114:19-115:24. That same day the Franklin County Commonwealth's Attorney requested that the Franklin County charges be dismissed. Letter Requesting Cases be "Nolle Prosed," Dkt. No. 40-16, at 2.

Lamb continued to believe that he had correctly identified Lucas' left thumb as matching the latent print off of the piggy bank recovered at the scene of the Fredericksburg burglary until the instant litigation began. Lamb has since re-compared the prints and now believes that his initial

---

[15] Lamb also learned that Lucas had a size twelve shoe. Lamb Dep., at 184:4-11. That did not match the footprint Lamb had retrieved from the yard next to the scene of the Fredericksburg burglary, but because he did not know for certain who made the shoeprint, Lamb did not consider that fact particularly relevant. Id. at 187:22-188:3.

[16] Lamb testified that he did not meet with a member of the Commonwealth's Attorney's Office on April 25 because the attorneys "were all in court" that morning. Lamb Dep., at 180:3-11.

match was incorrect and that Lucas' left thumb was not the source of the latent print from the Fredericksburg burglary.  Lamb Dep. at 41:2-21.

No party now disputes the fact that Lucas did not commit either the Franklin County or the Fredericksburg burglary or the fact that Lamb incorrectly matched Lucas' prints to the Fredericksburg latent prints.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties.  Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citation omitted).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party.  Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)).  Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S Ct. 1861, 1863 (2014) (per curiam)).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255.  However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252).  Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249).

### III.

Both Lamb and Shively assert that they are entitled to summary judgment because they are protected by qualified immunity.  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Smith v. Gilchrist, 749 F.3d 302, 307 (4th Cir. 2014) (citing Stanton v. Sims, 134 S.Ct. 3, 4 (2013) (per curiam)).  Significantly, qualified immunity entails a two prong test: (1) the allegations underlying the claim, if true, must substantiate a violation of a federal statutory or constitutional right, and (2) such a violation must be of a clearly established right of which a reasonable person would have known." Id. at 308 (quoting Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)); see also Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (finding qualified immunity involves a two-step inquiry, asking first whether a constitutional violation occurred and second whether the right violated was clearly established).

It is within the court's discretion to decide which prong to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Durham, 690 F.3d at 188 n.6. Here, the court will address prong one first. Plainly, "[i]f an officer did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there." Henry, 652 F.3d at 531 (internal alterations omitted) (quoting Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007). Here, Lucas cannot prevail on any of his federal claims if the defendants had probable cause for Lucas' arrest. See White v. Maryland Transp. Auth., 151 F. Supp. 2d 651, 655 (D. Md. 2001) ("On the federal claims for false arrest, false imprisonment, and malicious prosecution, the dispositive question is probable cause."), quoted in Gregg v. Richmond, No. CIV.A. DKC 2001-1212, 2004 WL 257080, at *2 (D. Md. Feb. 11, 2004); Pleasants v. Town of Louisa, 847 F. Supp. 2d 864, 879 (W.D. Va. 2012) (quoting Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974) ("'[T]here is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause.'"); Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005) (citing Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 183-84 (4th Cir. 1996)) (holding that a section 1983 malicious prosecution claim requires, inter alia, seizure pursuant to legal process not supported by probable cause). The same is true of his pendent state law tort claims. See Savage v. Cnty. of Stafford, Va., 754 F. Supp. 2d 809, 816 (E.D. Va. 2010) (citing Veney v. Ojeda, 321 F.Supp.2d 733, 747 (E.D. Va. 2004)) ("Under Virginia law, where a law enforcement officer acts in good faith and with probable cause, he cannot be held liable for false arrest."), aff'd sub nom. Savage v. Sturdivant, 488 F. App'x 766 (4th Cir. 2012); Lewis v. Kei, 281 Va. 715, 724-25, 708 S.E.2d 884, 891 (2011) (holding that a warrant supported by probable cause is a bar to liability for false imprisonment).

The Supreme Court has described probable cause as a "flexible, common-sense standard." Florida v. Harris, 133 S. Ct. 1050, 1053 (2013) (citing Illinois v. Gates, 462 U.S. 213, 239 (1983)). In this case, "[p]robable cause existed if 'at the moment the arrest was made . . . the facts and

circumstances within [the defendants'] knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [Lucas] had violated [the law]." Hunter v. Bryant, 502 U.S. 224, 228 (1991) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (collecting authorities) ("This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."). Thus, while probable cause requires "more than mere suspicion of wrongdoing," it "requires much less evidence than needed to convict." Walker v. Scott, No. 7:05-CV-00010, 2006 WL 1288315, at *6 (W.D. Va. May 4, 2006), aff'd, 203 F. App'x 447 (4th Cir. 2006); see also Wilkes v. Young, 28 F.3d 1362, 1366 n.3 (4th Cir. 1994) (citing Bennett v. City of Grand Prairie, Texas, 883 F.2d 400, 405 (5th Cir. 1989), for the proposition that "probable cause requires much less evidence than is required to convict"). Indeed, probable cause is a lower standard than "more likely than not," i.e., a preponderance of the evidence. See United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012) (reversing where the district court "erroneously elevated the probable cause standard to one more demanding than a preponderance").

Instead, what is required is a "fair probability," given all the circumstances. Gates, 462 U.S. at 238; see also id. at 246 ("[P]robable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability[.]"); Harris, 133 S. Ct. at 1055 (alterations in original) (citing Gates, 462 U.S. at 232) ("All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"). Moreover, the Supreme Court has noted that it is a fundamental principle that courts "do not evaluate probable cause in hindsight[.]" Harris, 133 S. Ct. at 1059 (citing United States v. Di Re, 332 U.S. 581, 595 (1948)). In terms of an arrest, the relevant question is whether probable cause existed at the time. Hunter, 502

U.S. at 228.   Finally, it is well established that "[n]ot every mix-up in the issuance of an arrest warrant, even though it leads to the arrest of the wrong person with attendant inconvenience and humiliation, automatically constitutes a constitutional violation for which a remedy may be sought under 42 U.S.C. § 1983."  Thompson v. Prince William Cnty., 753 F.2d 363, 364 (4th Cir. 1985).

## IV.

Plainly, Shively had probable cause when he sought warrants for Lucas' arrest.  He was told by Lamb, a fingerprint examiner, that there was a match between the prints recovered from the two crime scenes.  He then canvassed businesses in the area of the Franklin County burglary, asking for a person with the name "Ryan" who matched the physical description provided by the Fredericksburg victim.  A citizen tipster provided him with the name of Andre Lucas, the father of Ryan Lucas. Shively sent Lucas' known fingerprints to Lamb, and was then informed by Lamb that Lucas' known prints matched the latent prints from the Fredericksburg burglary.  Certainly, at that point in time, Shively had sufficient inculpatory information to meet the probable cause standard.  Lucas' Sheriff's Office file and DMV records indicated that Lucas, at least at some point, lived near the scene of the Franklin County burglary.  As discussed in more detail below, Lucas generally matched the physical description provided by the Fredericksburg victims.  Most critically, Shively had information forensically linking Lucas to both crimes scenes.  The evidence at the time thus provided a "fair probability" that Lucas had committed the Franklin County burglary.  As such, Shively was entitled to seek out warrants for Lucas' arrest when he did so.

Lucas argues that "Shively relied on information from an informant's confidential information who [he] had no reason to trust or believe."  Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 44, at 20.  But Shively had no reason to distrust or disbelieve the information he received from storeowner.  Moreover, this information merely prompted further investigation.

Shively did not arrest Lucas based on this "rumor," but did exactly what is expected of a detective: investigate a lead.

Lucas also asserts that Shively's representation in his warrant application that Lucas was forensically linked to the Franklin County burglary was "a complete fallacy." Id. This claim is difficult to comprehend. Shively was told by Lamb, a fingerprint examiner, that the fingerprints from both burglaries matched and that Lucas' known prints were a match to the latent prints from the Fredericksburg burglary. Shively's reliance on Lamb's statements was reasonable. Non-fingerprint examiners must be able to rely on the representation of experts in the field; otherwise non-examiners would never be able to be use fingerprint analysis in their probable cause determinations.

Indeed, "a police force could not function without reasonable reliance on the statements and efforts of others." Liu v. Phillips, 234 F.3d 55, 57-58 (1st Cir. 2000) (citing Whiteley v. Warden, 401 U.S. 560, 568 (1971)); see also United States v. Hensley, 469 U.S. 221, 231 (1985) (citing United States v. Robinson, 536 F.2d 1298, 1299 (1976) ("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another . . . .").

The First Circuit's decision in Burke v. Town of Walpole, 405 F.3d 66 (1st Cir. 2005), is instructive. In that case, the defendant police officers included the opinion of a forensic dentist in their application for a search warrant. The dentist determined that bite marks on a murder victim were made by human teeth and that, "with reasonable scientific certainty," they were made by the plaintiff, Edmund Burke. Id. at 80. Burke was ultimately exonerated by other forensic evidence and released from pre-trial detention after spending forty-one days in jail. Id. at 74.

Burke ultimately brought suit against a number of defendants on a number of theories. Most relevant to the court's analysis here is Burke's claim that "the police defendants should have

known that [the forensic dentist's] bite mark opinion was inaccurate and unreliable, and that they acted with reckless disregard for the truth by including that evidence in the arrest warrant application." Id. at 81 (internal footnotes omitted). The First Circuit held that

> [w]hile Burke assails the reliability of bite mark analysis generally, he does not dispute [the forensic dentist's] credentials or point to any evidence that the police had any reason to doubt [the forensic dentist's] opinion. Burke thus fails to establish that "circumstances evinced obvious reasons to doubt the veracity" of the inculpatory bite mark evidence, and fails to preserve a genuine dispute on his claim that inaccurate evidence was recklessly included in the warrant application in violation of his Fourth Amendment rights.

Id. at 83 (internal alterations omitted) (quoting United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002)). Lucas' argument contains precisely the same flaw in this case. He has failed to present any evidence of circumstances evincing reasons for Shively to doubt the veracity of Lamb's fingerprint analysis at that time he sought warrants for Lucas' arrest.[17]

Furthermore, an officer does not need to rely on a foolproof source of forensic evidence in order to meet the probable cause standard.

> [F]orensic evidence relied upon by the police to establish probable cause to arrest need not be unassailably accurate. "[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom."

Id. at 80 (alterations in original) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 255 (1st Cir. 1996)). There may be a hypothetical situation in which a law enforcement officer unreasonably relies on the opinion of a qualified forensic expert, but such a situation would require a highly extreme and unusual fact pattern. No such scenario exists here. Lucas has provided no evidence that Shively had any reason whatsoever to doubt Lamb's analysis.

---

[17] The First Circuit reserved the district court's grant of summary judgment as to one police defendant, finding that Burke had provided sufficient evidence viewed, in the light most favorable to him, that the officer had received exculpatory DNA evidence and intentionally or recklessly withheld it from the officer preparing the warrant for Burke's arrest. Burke, 405 F.3d at 84. On the rest of Burke's claims the First Circuit affirmed summary judgment. Id. at 96.

Lucas also argues that Shively violated "protocol" requiring him to have fingerprints examined by the Virginia Department of Forensic Science Western Laboratory ("the Lab"). As an initial matter, the court is at a loss as to what protocol Lucas is referencing. Although Lucas refers to an unnamed and unsourced protocol in his pleadings, it is never accompanied by a citation to the record. See Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 44, at 20, 22, 25. The court has combed the exhibits and deposition transcripts to no avail. In fact, plaintiff's counsel specifically asked Shively if, since Lucas' arrest, he had been instructed not to seek arrest warrants until receiving fingerprint analysis from the Lab. Shively answered that he had not been so instructed. Shively Dep., at 180:20-181:1. Thus, Lucas has failed to provide evidence that there was any protocol requiring Shively to act only on fingerprint analysis done by the Lab.

More fundamentally, violations of internal police protocols do not automatically translate into violations of a person's constitutional rights. See Steen v. Myers, 486 F.3d 1017, 1023 (7th Cir. 2007) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 838 (1998)) ("[A] failure to comply with departmental policy does not implicate the Constitutional protections of the Fourteenth Amendment."). "That [a police department's standard operating procedures] might require an officer to refrain from making an arrest under [a given set of] facts does not eliminate the existence of probable cause." Tanberg v. Sholtis, 401 F.3d 1151, 1158-59 (10th Cir. 2005); cf. Thompson v. City of Chicago, 472 F.3d 444, 455 (7th Cir. 2006) ("Whether [an officer's] conduct conformed with the internal [police department general orders] concerning the use of force on an assailant was irrelevant to the jury's determination of whether his actions . . . were 'objectively reasonable' under the Fourth Amendment."). Thus, even assuming that Shively did violate some internal protocol, it would not overcome the other facts and circumstances in support of probable cause.

Lucas further argues that Shively "ignored significant problems with the[] case against [Lucas] and rushed to get warrants based on unfounded information." Pl.'s Br. in Opp'n to Defs.'

Mot. for Summ. J., Dkt. No. 44, at 20-21. Specifically, Lucas notes that Shively sought warrants against him even though he had not heard from the Lab. Again, even assuming that the Sheriff's Office had some protocol requiring the use of forensic evidence provided by the Lab alone, the violation of internal protocols cannot be contorted into a constitutional violation or lack of probable cause. Shively's reliance on the forensic evidence provided by Lamb was reasonable and he was not required to wait for the Lab's analysis to meet the probable cause standard.

Next, Lucas notes the discrepancy between his weight as listed in his DMV records and the weight estimate given by the Fredericksburg victim. Even setting aside the obvious fact that adult human beings are capable of gaining or losing significant amounts of weight, this argument is without merit.[18] The Fourth Circuit has held that such details that, with hindsight, may have alerted police that they were arresting the wrong person are not sufficient to defeat other indicia of probable cause. In <u>Thompson v. Prince William County</u>, 753 F.2d 363 (4th Cir. 1985), the Fourth Circuit addressed the case of Lisa Ann Thompson, who had been mistakenly arrested for drug trafficking. Thompson brought a Section 1983 action against the officers responsible for her arrest. The Fourth Circuit affirmed the dismissal of her claims, noting that

> [w]hile there are details which with hindsight might have alerted the undercover agent or the officer serving the warrant that Lisa Ann Thompson might not be the person sought, it simply demands too much to expect police officers, on the basis of slight discrepancies of height (5' 5" as against 5' 7") and weight or in color of eyes (blue versus brown) and hair (blond as opposed to brown), to abandon obtention or execution of a warrant on someone who, for other strong indications (identity of first name, confirmation of the first name by a police informant, close connection with vehicle registered in Lisa Ann Thompson's name), meets the warrant's description.

---

[18] Lucas himself has remained roughly the same weight since his was fifteen. Lucas Dep., at 16:7-13. This fact, however, is irrelevant because such information was gathered during the course of discovery for this litigation, not during the investigation. Any argument that Shively should have discovered this fact during his investigation is addressed <u>supra</u> p. 26.

Id. at 365.  The Fourth Circuit concluded that it was "satisfied that under the totality of the circumstances there was probable cause to support application for and execution of the warrant, and that the warrant was valid."  Id. (citing Illinois v. Gates, 462 U.S. 213, 239 (1983)).

Here, Shively had significantly more "strong indications" that Lucas was the proper person for whom to obtain a warrant than the officers who arrested Thompson.  First, as has been discussed at great length, there was the forensic link between Lucas and the crimes scenes.  Second, the general physical description – sex, race, height, hair color – matched.  Importantly, once Shively and Lamb realized the most significant physical characteristic of the suspect, the full sleeve tattoos, did not match Lucas, they promptly began to acquire other exculpatory evidence leading to the prompt dismissal of all charges.[19]  As such, it would "simply demand[] too much to expect police officers" possessing a matching thumbprint and an otherwise matching physical description to abandon obtention of a warrant based on such a weight discrepancy (210 pounds as opposed to 140-165 pounds).[20]  Similarly, Lucas' observation that he had an address in Franklin County and did

[19] Lucas asserts that both Shively and Lamb continued to detain him even after they became aware that he was not the culprit of the burglaries.  The evidence tells a different story.  Lamb began investigating Lucas' alibi at 9:13 a.m. on April 25, 2012, the day after the arrest.  By day's end, he had acquired a fax of Lucas' timesheet, discussed the problematic tattoos with Shively, spoken with Lucas' mother, and informed his superior officer of the situation.  The next day, April 26, 2012, Lamb met with the Fredericksburg Commonwealth's Attorney, and related his view that the charges against Lucas should be dropped.  The Fredericksburg charges were, in fact, dismissed by Order dated April 27, 2012.  Later that day, Lucas was released from custody in Franklin County.  As for Shively, he was informed for the first time that Lucas was not in fact forensically linked to the Franklin County burglary on April 26.  The Franklin County charges were dismissed on April 30, 2012, some three days after Lucas' release.  See facts outlined infra pp. 12-15.  It is clear that Lamb acted promptly to investigate Lucas' alibi, and when it appeared that it checked out, both he and Shively took steps to secure Lucas' release.  Thus, to the extent Lucas' malicious prosecution claim rests on what occurred after his arrest, summary judgment for the defendants is still appropriate.

[20] Indeed, in Garcia v. City of Chicago, No. 08 C 05380, 2011 WL 4348136 (N.D. Ill. Sept. 15, 2011), the court found that an even larger weight differential (245 pounds as opposed to 160 pounds), even paired with a six to seven inch height disparity, was insufficient to create a dispute of a material fact where the plaintiff had the same name and birth date as the person named in the arrest warrant.  Id. at *1, 3.

not live in Fredericksburg does not nullify the other inculpatory evidence Shively had.  There is little

if any exculpatory value in the fact that Lucas had an address very close to one crime scene and

within a reasonable drive of the other.

Lucas also points to the different "modus operandi" involved in the two burglaries (breaking

in and stealing significant valuables versus sneaking in through an unlocked door to swipe petty

cash).  However, there was sufficient other evidence, most importantly the forensic evidence, to

support probable cause without a similar modus operandi.  Indeed, a forensic link to two different

crime scenes can establish probable cause for both no matter how disparate the behavior involved in

the offenses.  A criminal may progress to more sophisticated and serious offenses as he or she

advances in a criminal career, or become ever more desperate and careless while struggling to feed

an addiction.  Or a criminal may fluctuate between offenses serious and petty based simply on

happenstance of opportunity or on personal whim.  A unique method of operation may at times

indicate a link between crimes, but that lack of a similar modus operandi is not inherently evidence

that a link does not exist.

Lucas also complains that Shively failed to "compare[] the footprints from the two crime

scenes to determine if they matched," and "did not attempt to locate or talk to [him] or his family or

use the DMV photo in a photo array for the Fredericksburg homeowner before obtaining the

warrants."  Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 44, at 21.  However, the Fourth

Circuit has expressly held that a law enforcement officer is "'not required to exhaust every

potentially exculpatory lead or resolve every doubt about [a suspect's] guilt before probable cause [is]

established.'"  Durham v. Horner, 690 F.3d 183, 190 (4th Cir. 2012) (citing Miller v. Prince George's

Cnty., Md., 475 F.3d 621, 632 (4th Cir. 2007).  "It will always be possible to take additional

investigatory steps.  But the law sensibly does not determine reasonableness based on second-

guessing with the benefit of 20/20 hindsight."  Brown v. Wiita, 7 F. App'x 275, 280 (4th Cir. 2001)

(unpublished per curiam opinion) (internal alterations and quotation marks omitted) (citing <u>Rowland v. Perry</u>, 41 F.3d 167, 174 (4th Cir. 1994); <u>Thompson</u>, 753 F.2d at 365). This is so even when the officer "might have avoided the mistake by conducting additional investigation." <u>Id.</u> Additionally, commonsense dictates that officers are not inexorably required to speak with criminal suspects and/or their friends and family in order to meet the probable cause standard. A suspect may well seek to destroy evidence or evade capture if he or she is made aware that an investigation is pending. Law enforcement may reasonably acquire probable cause by other investigatory methods.[21]

Nor can anything untoward or improper be implied from the fact that Shively (and Lamb) conducted further investigation after Lucas' arrest. The defendant officers were seeking to support a prosecution that would need to meet the beyond a reasonable doubt standard, the highest burden of proof known to the law and a significantly greater burden than that of probable cause. Accordingly, further investigation does not imply that the investigation into probable cause was fatally flawed.

In short, at the time of Lucas' arrest, the facts and circumstances within Shively's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that Lucas had violated the law.

## V.

Lamb was presented with the same facts and circumstances as Shively. As such, much of the same analysis applies to Lucas' claim against Lamb. However, the obvious significant difference between Shively and Lamb is that Lamb was the source of the mistaken fingerprint identification.[22]

---

[21] It is worth noting that, after Lucas was arrested, the Fredericksburg victim in fact picked out Lucas' picture (along with one other) as looking like the burglar. The victim further asserted that he was sure that he had at least seen Lucas in the neighborhood before. Lamp Dep., at 190:20-191:3. It is thus highly doubtful a photo array would have exonerated him.

[22] Lucas also claims that Lamb gave undue weight to the information provided by the homeless person who was transported to Snowden after speaking with the Fredericksburg police. However, Lamb's contemporary statements clearly show that he viewed this information with a good deal of skepticism. Lamb began his investigation with the name "Ryan" as a tip; he did not end it with that.

It is undisputed that Lamb erred in matching Lucas' fingerprint to the latent print recovered from the Fredericksburg burglary scene.

However, mere "negligence or innocent mistake" on the part of Lamb is insufficient. Miller v. Prince George's Cnty., MD, 475 F.3d 621, 627-28 (4th Cir. 2007) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)). Lucas' claims against Lamb can survive summary judgment only if there is sufficient evidence for a jury to find that Lamb acted deliberately or with a "reckless disregard for the truth" in averring in support of probable cause that Lucas was forensically linked to the crime scene. Id. at 627; see also Matthews v. Thomas, 385 F. App'x 283, 287 (4th Cir. 2010) (unpublished) (citing Miller, 475 F.3d at 627) (same).

> Reckless disregard can be established by evidence that an officer acted with a high degree of awareness of a statement's probable falsity, that is, when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.

Davis v. Bacigalupi, 711 F. Supp. 2d 609, 622 (E.D. Va. 2010) (internal alterations and quotation marks omitted) (citing Miller, 475 F.3d at 627).

At the hearing, Lucas argued that because Lamb failed to have another fingerprint examiner verify his conclusion, he recklessly disregarded the verification procedures of the ACE-V methodology that make fingerprint analysis reliable. As previously noted, the court ordered supplemental briefing on this issue. Lucas asserts that by failing to follow the final verification step of the ACE-V methodology, Lamb's analysis was rendered so unreliable that employing it to support probable cause constituted reckless disregard for the truth. In support of this argument, Lucas' supplemental briefing directs the court primarily to fingerprint guidelines and manuals and the declarations and statements from fingerprint examiners regarding the importance of the ACE-V methodology, in particular the final verification step. See Pl.'s Supplemental Br. in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 63, at 3-6.

Lamb, by contrast, cites the Fourth Circuit's decision in <u>United States v. Crisp</u>, 324 F.3d 261 (4th Cir. 2003). In <u>Crisp</u>, the Fourth Circuit upheld the district court's admission of a fingerprint examiner's opinion, even though that opinion was not subject to an independent review by another examiner. <u>Id.</u> at 268 n.4 ("Here, there was no . . . independent review"); <u>see also</u> <u>id.</u> at 276 (4th Cir. 2003) (Michael, J., dissenting) (noting that "in many cases, including this one, no verification takes place"). Given this holding, it is difficult to see how Lamb's use of an unverified opinion in a probable cause determination can be viewed as reckless. If such an opinion is sufficiently reliable to pass muster under the <u>Daubert</u> inquiry in the eyes of the Fourth Circuit, it surely must follow that it is sufficiently reliable for use in a probable cause determination.

The two cases cited by Lucas are not on point. The district court in <u>United States v. Aman</u>, 748 F. Supp. 2d 531 (E.D. Va. 2010), discussed the <u>Crisp</u> decision and found that the government's fingerprint expert met the <u>Daubert</u> standard. It did not, however, address the issue of whether an unverified fingerprint examiner's opinion would meet that standard as <u>Crisp</u> did. The Arizona Court of Appeals decision in <u>State v. Castillo</u>, No. 2 CA-CR 2011-0215, 2012 WL 1080909 (Ariz. Ct. App. Mar. 30, 2012) (unpublished), has even less relevance to this case. In <u>Castillo</u>, the issue was not the reliability of fingerprint analysis. Instead, the defendant challenged his conviction on the basis of hearsay and the Confrontation Clause, arguing that the trial court erred in allowing a fingerprint examiner to testify that her work was verified by another examiner. <u>Id.</u> at *1. In its brief opinion denying the appeal, the court rehashed the testimony of the fingerprint examiner at issue and incidentally outlined the ACE-V process. <u>Id.</u> The opinion does not address the issue of whether an unverified fingerprint examiner's opinion would meet a particular threshold of reliability.

In sum, given that the Fourth Circuit has affirmed that an unverified fingerprint analysis meets the basic threshold for scientific reliability, this court cannot hold that Lamb acted with a

"reckless disregard for the truth" in averring that Lucas was forensically linked to the crime scene based on the fact that his analysis had not been independently verified.

## VI.

It is indisputable that Lucas suffered significant harm from this episode – not only did he lose his liberty for three days for crimes he did not commit, but he also suffered the indignities associated with being arrested and detained. The evidence clearly establishes, however, that the cause of that harm was a simple mistake. Law enforcement officers, like all individuals, will inevitably make mistakes. It is the nature of their high-stakes work that harm will often result when they do. That is undeniably unfortunate. However, recognizing the difficulty of police work, the law only holds individuals liable for deliberate or reckless conduct. The misidentification of Lucas' thumbprint by Lamb does not meet this standard.

Furthermore, the other factors Lamb and Shively used to determine probable cause were proper under the law. Finally, the "significant problems" Lucas alleges existed in the case against him at the time of his arrest may have provided grounds on which to argue reasonable doubt, but certainly did not come close to defeating the much lesser standard of probable cause. As such, the court is compelled to award summary judgment in favor of the defendants.

An appropriate Order will be entered this day.

Entered: July 7, 2014

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge